UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | Criminal No.: 11-004-01S |
| v. ) | |
| ) | Violations: |
| LUIGI MANOCCHIO, a/k/a "Louie", ) | |
| a/k/a "Baby Shacks", a/k/a "The Old Man," ) | 18 U.S.C. § 1951(a) |
| a/k/a "The Professor" ) | |
| ) | |
| Defendant ) | |

# MEMORANDUM OF LAW IN SUPPORT OF THE
# GOVERNMENT'S MOTION FOR PERMANENT ORDER OF DETENTION

The government hereby moves pursuant to 18 U.S.C. § 3142 (e)(1), (f)(1)(A) and (f)(2)(A)&(B) for a permanent order of detention with respect to defendant Luigi Manocchio. Manocchio is a prominent member and leader of the New England organized crime family, also known as the Patriarca crime family –a criminal enterprise responsible for a wide range of criminal activities which operates principally in Massachusetts, Rhode Island and Connecticut. The Patriarca crime family is part of the nationwide criminal enterprise known as *La Cosa Nostra* (LCN), also known as "the mafia" and "the mob" that operates throughout the United States through entities known as families. Manocchio has held various leadership positions, including underboss and boss, in the New England family of the LCN (NELCN).

As further described below, Manocchio's past behavior conclusively demonstrates that he poses a serious risk of flight and is a danger to the community. As such, there is no condition or combination of conditions of release that would reasonably assure his appearance and the

1

safety of the community, including the witnesses against him. For these reasons, defendant Manocchio should be detained pending trial.

I.     **Indictment and Investigation**

   A.     <u>Indictment</u>

On January 7, 2011, a grand jury sitting in the District of Rhode Island returned a two-count indictment against Luigi Manocchio and Thomas Iafrate, alleging in Count One that beginning at least as early as 1993, they conspired together and with others to extort "protection" payments from the owner of two adult entertainment businesses in Providence, the Cadillac Lounge and the Satin Doll strip clubs, in violation of the Hobbs Act, 18 USC § 1951. Count Two alleges a specific incident of extortion involving Manocchio and Iafrate that took place on or about November 6, 2008. The indictment alleges that Manocchio is a member and former boss of the NELCN and that Iafrate is an NELCN associate. In recognition that these charged offenses were carried out as part of the larger NELCN criminal enterprise, the government anticipates seeking a superceding indictment in the near future that will expand upon the current charges and add additional defendants.

   B.     <u>Investigation</u>

The indictment returned in this matter stems from an FBI investigation into the NELCN's relationship with the adult entertainment industry in Providence, Rhode Island. The investigation has revealed that various facets of the adult entertainment industry have been forced to make tribute or "protection" payments to the NELCN, an enterprise that utilizes violence and the implicit threat of violence to enrich its members and associates.

The current investigation has confirmed that the NELCN continues to operate as a criminal enterprise with a defined structure, chain of command, and criminal objectives. During the course of this investigation, the FBI has developed multiple witnesses, including formally initiated or "made" members of the NELCN, who will testify that the NELCN exists, that Manocchio succeeded Francis "Cadillac Frank" Salemme as it's boss upon Salemme's incarceration in the 1990s and that he thereafter directed the affairs of the enterprise until sometime in 2008 or 2009, when he stepped down as a result of law enforcement scrutiny, including the execution of a search warrant on his person in November 2008, resulting in the seizure of $2900 in "protection" money extorted from the Cadillac Lounge and delivered to Manocchio by co-defendant Iafrate.

These witness will further testify to the secret initiation ceremony at which newly inducted members of the LCN swear a blood oath of loyalty to enforce "omerta," the code of silence, and to commit acts of violence whenever called upon to do so for the sake of their shared criminal enterprise.

Evidence gathered during this investigation will show that the boss, Manocchio, aided by members and associates of the NELCN, used the reputation of the NELCN for violence to force victims into submitting to illegal demands in carrying out extortionate money making schemes, including a long running extortion of the Cadillac Lounge and Satin Doll, in which "protection" payments were delivered to Manocchio from a daily $125 set-aside taken by Iafrate from the Cadillac Lounge. Implied threats of physical violence and economic harm were used to instill fear in the victims and discourage any resistance.

The facts to prove the existence of the NELCN and the defendant's roles within the enterprise and the extortion conspiracy, as well as the particular acts of extortion, will be established at trial through the testimony of cooperating witnesses, consensual recordings, court-authorized intercepts of oral and wire communications, physical and documentary evidence, and testimony of law enforcement concerning physical surveillance.

**II.     Legal Standard**

    **A.     The Bail Reform Act**

The release or detention of a defendant charged with a crime is governed by the Bail Reform Act, Title 18, United States Code, Sections 3141 et seq. The determination of whether to detain a defendant pre-trial is made pursuant to 18 U.S.C. § 3142(e), which provides that the presiding judge shall order the detention of a defendant pending trial "[i]f, after a hearing ... the judicial officer finds that no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of any other person and the community." A finding of dangerousness must be supported by clear and convincing evidence while a finding of risk of flight must be supported by a preponderance of the evidence. *See* U.S. v. Tortora, 922 F2d 880 (1st Cir. 1990) and U.S.v. Patriarca, 948 F 2d 789 (1st Cir. 1991).

The Bail Reform Act lists four factors to be considered in the detention analysis: (1) the nature and circumstances of the crimes charged; (2) the weight of the evidence of the defendant's guilt; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger posed by the defendant's release See 18 U.S.C. § 3142(g).

### B. Organized Crime Defendants

District courts in this Circuit routinely have faced the issue of pretrial detention of organized crime defendants charged with racketeering-related offenses. In those cases, Courts have held that membership in, and leadership in the LCN, while not the end of the inquiry, is a highly relevant consideration in a pretrial detention analysis and can weigh in favor of detention. U.S. v. Patriarca, 948 F 2d 789 (1st Cir. 1991); U.S.v. Tortora, 922 F2d 880, 885-888 (1st Cir. 1990) *See also*, United States v. DiGiacomo, 746 F. Supp. 1176, 1182 (D. Mass 1990)("Among other things, a defendant's role in the Mafia is relevant because leaders or individuals with the ability to direct the criminal activity of others pose a special threat to the safety of the community."); United States v. Simone, 317 F Supp.2d 38(D. Mass 2004).

### III. Government's Motion for Detention

The government moves for a detention hearing and a permanent order of detention with respect to defendant Manocchio, on the basis that he poses a serious risk of flight and a danger to the community. Manocchio is charged herein with a crime of violence, defined in18 U.S.C. §3156(a)(4)(A), as having as an element of the offense "the use, attempted use, or threatened use of physical force against the person or property of another." Each charged count in violation of 18 U.S.C. § 1951 carries a maximum penalty of 20 years in prison, therefore the prerequisites for a detention hearing under § 3142(f)(1)(A) have been satisfied. Detailed below is a proffer of the relevant facts in support of the pretrial detention of defendant Manocchio as they relate to each of the four § 3142(g) factors:

### A.     Nature and Circumstances of Charged Offenses

As noted, Manocchio is charged in Count One with extortion conspiracy and in Count Two with an actual incident of extortion carried out pursuant to the conspiratorial agreement with Iafrate and others.  The investigation has revealed that Manocchio has a network of loyal associates who he is able to direct to do his bidding.  Among these associates is his co-defendant, Thomas Iafrate.  Over an extended period of time, Iafrate was collecting cash payments and personally delivering them to Manocchio.  The payments were made to Manocchio solely because of his position as a boss in the Patriarca Crime Family of La Cosa Nostra and that organization's well-known reputation to exact violence against those who do not capitulate to their demands.

Manocchio is facing a substantial sentence under the pending indictment.  A conservative calculation under the Sentencing Guidelines indicates that his criminal conduct would result in an Offense Level of 29, which, in Criminal History category I, would result in a Guidelines sentencing range of between 87 and 108 months' incarceration.  The prospect of a lengthy period of incarceration favors detention, as there is no reason to expect that Manocchio, who will soon turn 84 years old, will voluntarily submit to a prosecution whose conclusion brings with it the high likelihood of him dying in prison.

### B.     Weight of the Evidence

The grand jury has already found probable cause that Manocchio has committed the charged crimes.  The evidence against Manocchio and his co-defendant is strong and consists principally of the testimony of a number of cooperating witnesses who are substantially corroborated by consensual recordings, electronic intercepts of conversations occurring amongst

Iafrate and other NELCN associates at the Cadillac Lounge, documentary evidence showing the daily set-aside for Manocchio of $125 by Iafrate from Cadillac Lounge receipts, and physical surveillance over an extended period showing Iafrate meeting with Manocchio on a monthly basis to deliver the accumulated money set-aside pursuant to the extortion conspiracy.

Court-authorized intercepts of conversations occurring within the Cadillac Lounge amongst Iafrate and other LCN associates loyal to Manocchio, demonstrate both the ongoing extortion and its primary beneficiary. Though these individuals are careful not to refer to Manocchio by name, it is clear they are referring to him. For example, on June 3, 2008, at approximately 11:10 a.m., Iafrate had a conversation with a bouncer at the Cadillac Lounge. During this conversation in the Lounge office, this bouncer asked Iafrate if he had spoken to Richard Shappy, owner of the Cadillac Lounge, about "the old man" "going up a dime" to "five dimes". Iafrate indicated that he had not had such a discussion. This is a reference to Manocchio (known by the nickname "the old man") increasing the monthly extortion/protection payment from the Cadillac Lounge by $1,000 to $5,000 per month. Later in the conversation, Iafrate stated that he would like to tell Richard Shappy that "it is six, not five," indicating that he would like to tell Richard Shappy that the payment to Manocchio was going to be $6,000 per month as opposed to the increase to $5,000 suggested by the bouncer.

Beginning in April, 2008, law enforcement agents initiated surveillance of Manocchio and Iafrate during the first two weeks of each month, in an effort to corroborate source information that Iafrate would meet Manocchio early each month to deliver the proceeds of the Cadillac Lounge extortion. Manocchio is known to live in an apartment at 433 Atwells Avenue, Providence, Rhode Island that is above Addie's Laundromat, located at 431 Atwells Avenue.

Manocchio is known by law enforcement to conduct LCN business at both Addie's and the Euro Bistro restaurant, a short distance from Addie's at 441 Atwells Avenue.

At some point within the first 10 days of April, May, July, August and September of 2008, law enforcement agents observed Iafrate arrive at and enter Addie's Laundromat or Euro Bistro. On each of these occasions, Manocchio was confirmed by surveillance to be in the location where Iafrate was seen entering. In June, 2008, Manocchio was observed entering Addie's and a short time later, Iafrate was observed walking from the direction of Addie's. Similar surveillance efforts were initiated in early November, 2008, following issuance of an anticipatory search warrant from Magistrate Judge Almond on October 31, 2008, execution of which was premised upon a meeting between Iafrate and Manocchio.

On November 6, 2008, at approximately 5:00 p.m., Iafrate was observed meeting Manocchio at Euro Bistro, 441 Atwells Avenue, Providence, Rhode Island. At approximately 5:35 p.m., Iafrate left Euro Bistro and FBI agents immediately executed the search warrant on Manocchio inside Euro Bistro. They seized from the right suit coat pocket of Manocchio twenty-nine (29) hundred dollar bills held together by a money band with "3400" written on it. Iafrate was interviewed as he left Euro Bistro and consented to a search of his person which revealed that he had nine (9) one hundred dollar bills in his possession. The surveillance and successful search corroborates witness testimony that Iafrate delivered the extortion payment to Manocchio on a monthly basis.

Proof of Manocchio's position and history within the NELCN, essential to show *how* the extortion was achieved, is overwhelming and varied, ranging from electronic intercepts of a 1991 meeting at the Hilton Hotel in Boston of then NELCN Boss Frank Salemme and Gambino LCN

member Natale Richichi, in which Salemme identifies Manocchio as his underboss, to the plea agreement recently signed by NELCN soldier Anthony St. Laurent Sr in criminal case 09-041 (WES), in which he acknowledges that Manocchio was the NELCN boss as of 2006 when St. Laurent solicited a number of individuals to kill his LCN rival, Robert DeLuca.

St. Laurent Sr had little choice but to admit Manocchio's position in the criminal enterprise, for he had been secretly recorded several times alluding to Manocchio's position. In an April 6, 2006 recorded conversation in Johnston, Rhode Island, during which St. Laurent, Sr., and others conspired to extort money from two Massachusetts bookmakers, St. Laurent stated to one of the people present that "if we take down a score, I'm gonna take some off the top for the old man," referring to Manocchio. As a further example, on April 8, 2006, St. Laurent met with two individuals in Johnston, Rhode Island. During this meeting, recorded by a cooperating witness, St. Laurent solicited the two individuals to kill Robert DeLuca, whose initiation into the LCN was presided over by Raymond Patriarca, Jr. in an induction ceremony recorded by the FBI in 1989 in Medford, Massachusetts.

One of the two individuals solicited was a cooperating witness who expressed concern that DeLuca was a "made" member of the NELCN, and that they did not want to have problems with "Louie" if they killed DeLuca. St. Laurent replied that there would be "no repercussions," and that in fact, he would take the two individuals to see "him" (referring to Manocchio) after they killed DeLuca. The rules of the LCN generally prohibit any member from killing another member without first receiving permission from the head of the family. St. Laurent is indicating in this conversation that he has in fact received such permission from Manocchio.

Despite having stepped down from his position as boss of the NELCN, Manocchio is still active in the enterprise. In June, 2010, he was observed by law enforcement having an extended meeting with then acting NELCN Boss Peter Limone and underboss Anthony DiNunzio at a Chinese restaurant in Boston. His access to high ranking NELCN figures demonstrates his continued power and respect within the organization, a status that ensures the LCN will back him in efforts to flee and intimidate witnesses.

The foregoing evidence will show that Manocchio and others forced the owners of adult entertainment businesses to employ certain associates and to pay up to 6000 dollars a month in protection or tribute payments. To conceal his extortion, Manocchio attempted to insulate himself from the payments by use of middle men. These middle men, including Iafrate, created business records documenting the setting aside of money for the NELCN. A number of these records have been collected as evidence through subpoena as well as through the execution of a search warrant on the Cadillac Lounge in June, 2010, during which Iafrate was observed documenting the continued set-aside. Also seized during the search warrant from a safe in the office in which Iafrate was working was the collected set-aside to that point in the month, $2375.

    C.    **History and Characteristics of Defendant**

Manocchio is a long-standing member of the NELCN, who served as the boss and underboss for approximately fifteen years. As a member of the NELCN, he has taken an oath to swear lifelong loyalty to the LCN and its criminal way of doing business. Although he has lived in the community for years, he has no traditional ties to the community. The FBI investigation of Manocchio has revealed that he has virtually no assets traceable to him. Manocchio lives in a small apartment located above Addies Laundromat at 433 Atwells Avenue in Providence, Rhode

Island.  This property is owned by Amalia (Lia) M. Nero of 200 West Old Elm Road, Lake Forest, Illinois.  Although he has no businesses listed in his name, he is frequently seen at the Euro Bistro Café located at 441 Atwells Avenue.  This property is held in trust by Amalia (Lia) Nero.  The business is owned by Euro Bistro, Inc. with the president listed as Kenneth M. Turchetta.   Manocchio has reported his profession at various times on applications for U.S. passports as a real estate agent, restaurant manager and jewelry worker.   The financial investigation of Manocchio has revealed that his only asset is a prepaid funeral plan.

Manocchio has listed his cellular telephone number as (401) 744-7118 on passport applications, however cellular telephone provider records for that number indicate that the subscriber is William Smith, born in 1968 and living in Warwick, Rhode Island. His use of an alias even on the telephone he uses demonstrates a conscious effort on Manocchio's part to avoid law enforcement detection and thwart law enforcement's efforts to track him.  Manocchio appears to have little in the way of close familial ties to the community, indeed, during the booking process at the FBI offices in North Miami Beach following his arrest, Manocchio declined to identify any family members to be used an emergency points of contact and instead told the booking agent to list FBI Special Agent Degnan as his emergency point of contact.

Despite the lack of identifiable assets or income, Manocchio travels both domestically and internationally on a regular basis.  Manocchio has maintained a United States passport since 1961.  He has traveled throughout Europe.  Recent European travel include a trip to Italy in 2009, France in 2001, Switzerland in 1999 and 2000, and Germany in 1995.  Of great concern to the government is the fact that Manocchio has access to private aircraft for international travel.  A query with the Immigration and Customs Enforcement Administration's Private Aircraft

Enforcement System (PAES) reveals that Manocchio has traveled into the United States aboard a private jet departing from Toronto, Canada on September 10, 2006. That aircraft is a Gulfstream jet leased to and operated by Jet-A-Way Charters of Warwick, RI. Jet-A-Way is a company controlled by Frank Zamiello. Mr. Zamiello is a long-time associate of widely recognized LCN figures including Manocchio and one of his predecessors, NELCN boss, Raymond J. Patriarca.

PAES records further reflect that Manocchio traveled into the United States aboard this same aircraft, departing from Nassau, Bahamas on April 22, 2007. Manocchio was in the company of Zamiello on both the 2007 and 2006 trips. It is imperative to note that the PAES system reflects entries into the United States and there is very little in terms of safeguards to prevent Manocchio from departing the United States aboard this or similar privately owned aircraft.

The investigation has also shown that Manocchio apparently travels quite extensively within the United States. Records show that in February 2006 he traveled to Colorado for two weeks. Documentation shows another trip in April of 2007 during which he traveled from southern Florida to Denver. Those same records show that two days later he flew to Las Vegas and then three days later he returned to south Florida. Flight records show that in March of 2008 he flew to Bozeman, Montana where he stayed for a week after which he flew back into Boston. Evidence obtained by the government shows that Manocchio returned to Colorado in February of 2009, remained there approximately a week after which he returned to the Boston area. He regularly travels to Florida during the winter months where he stays for weeks at a time.

Manocchio is an experienced and sophisticated traveler who would have no difficulty undertaking a successful pattern of evasion of international scope. This point is exacerbated by

the fact that Manocchio has access to other individuals' credit. According to documents reviewed, various trips referenced above were paid for with credit cards belonging to individuals associated with Manocchio. His access to these outside sources of support would make locating Manocchio exceptionally difficult. When arrested in Florida, he was in possession of a credit card in the name of Louis Manocchio that subsequent investigation determined was not his own, but rather that of a nephew of the same name.

Manocchio is single. He enjoys remarkably good health and is well known for his dedication to remaining physically fit. There is virtually no reason for Manocchio to remain in the jurisdiction and face the potential of what amounts to a life-sentence.

Manocchio has a criminal record dating back to 1948. Most significantly, in 1969 Manocchio was indicted for his role in the mob-related murder of bookmakers Rudolph Marfeo and Anthony Melei, crimes for which several other LCN members, including then boss, Raymond L.S. Patriarca, were convicted. *See* State v. Patriarca, 308 A.2d 300 (RI 1973); State v. Manocchio 496 A.2d 931 (RI 1985). As described in several judicial opinions, Manocchio, however, chose to flee to avoid responsibility for his role in the murders. "Defendant Luigi Manocchio (Manocchio) was indicted in August of 1969 on two charges of accessory before the fact and one charge of conspiracy to commit murder. He evaded arraignment and prosecution for ten years by fleeing the jurisdiction." 496 A.2d at 932. "Manocchio was indicted in 1969 but fled the jurisdiction so that he evaded arraignment for ten years." State v. Manocchio, 523 A.2d 872, 873 (RI 1987). It is widely reported that throughout much of his fugitive status Manocchio lived outside of the United States. Manocchio surrendered and was arraigned in 1979. He was tried before a jury in Rhode Island Superior Court and was found guilty. That conviction was vacated

and in December 1988 he plead guilty to conspiracy to murder. He was sentenced to the time he had previously served. The following is a summary of his arrest and /or conviction history:

- 1948: Manocchio was arrested in Providence for robbery and was given 5 yrs suspended sentence /probation.

- 1952: Manocchio was arrested in Providence for assault and robbery and sentenced to 5 years suspended/probation.

- 1965 Manocchio was arrested for violation of gambling laws. No known disposition on these charges.

- 1965 Manocchio was arrested by the Internal Revenue Service, Criminal Investigations Division for willful failure to pay taxes. He plead guilty, was fined and placed on probation

- 1969: Mannochio was arrested for conspiracy to murder and fled. He was later sentenced in 1988 to time served (two and a half years).

- 1996 Manocchio was arrested for receiving stolen goods and sentenced to 1 year suspended /probation.

Amongst the particular components of a defendant's history and characteristics that § 3142(g)(3) requires a judicial officer to consider is the defendant's "record concerning appearance at court proceedings." Herein, the Court has before it a proven track record of what this defendant does when charged with a serious offense: he flees. Moreover, he has learned that such behavior can work to his advantage. As is made clear in the judicial opinions, his original conviction was overturned in part due to the fading memory of the primary witness against him, who was testifying to events that happened 15 years previously and who had developed Alzheimers while Manocchio was a fugitive. *See* Manocchio, 496 A.2d at 932-933. As described above, Manocchio has the motive, the resources and the experience to flee this prosecution if he is released. He presents a proven, serious risk of flight for which no combination of release conditions can assure his appearance.

### D. Manocchio Constitutes a Danger to the Community

As discussed above, Manocchio, in addition to being a serious flight risk, is a danger to the community as a leader of the NELCN. He directed the affairs of a longstanding criminal enterprise that has insinuated itself into various aspects of Rhode Island government, business and labor. His criminal record fails to adequately capture who Manocchio is. For example, his 1996 conviction for receiving stolen goods was the result of his being given a stolen refrigerator by members of a violent group of robber/burglars operating throughout Rhode Island and nearby Massachusetts. The refrigerator was provided to him as tribute to his position as Boss of the NELCN.

His ability to direct loyalists poses a threat to the government's witnesses and the population at large. His willingness to orchestrate and profit from the current extortion scheme demonstrates his lack of respect for the law and constitutes proof that no set of conditions the Court can impose on his liberty can protect the public or guarantee his appearance at future proceedings.

## Conclusion

For the reasons cited above, the government hereby moves for a permanent order of detention with respect to defendant Manocchio. The defendant is a longstanding member and respected former leader of a criminal enterprise whose members have a long history of criminal activity and flight from prosecution. Accordingly, Manocchio presents a serious risk of flight and poses a danger to the community and should be detained prior to trial.

Respectfully submitted,

UNITED STATES OF AMERICA

By its Attorneys,

PETER F. NERONHA
UNITED STATES ATTORNEY


/s/ *Scott Lawson*
Scott R. Lawson
Trial Attorney
Organized Crime & Racketeering Section
Criminal Division
U.S. Department of Justice

I hereby certify that on February 24, 2011 I filed the Government's Memorandum In Support of Detention electronically with service to all registered parties by the ECF system.

/s/ *Scott Lawson*
Scott R. Lawson
Trial Attorney
Organized Crime & Racketeering Section
Criminal Division
U.S. Department of Justice