UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | Criminal No.: 11-004-01S |
| v. ) | |
| ) | Violations: |
| LUIGI MANOCCHIO, a/k/a "Louie", ) | |
| a/k/a "Baby Shacks", a/k/a "The Old Man," ) | 18 U.S.C. § 1951(a) |
| a/k/a "The Professor" ) | |
| ) | |
| Defendant ) | |

**RENEWED MOTION TO DETAIN AND SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF THE UNITED STATES' MOTION FOR A PERMANENT ORDER OF DETENTION.**

The government hereby renews its motion and supplements its memorandum of law pursuant to 18 U.S.C. § 3142 (e)(1), (f)(1)(A) and (f)(2)(A)&(B), seeking a permanent order of detention with respect to defendant Luigi Manocchio. As previously set forth, Manocchio is a prominent member and leader of the New England organized crime family, also known as the Patriarca crime family –a criminal enterprise responsible for a wide range of criminal activities which operates principally in Massachusetts, Rhode Island and Connecticut. The Patriarca crime family is part of the nationwide criminal enterprise known as *La Cosa Nostra* (LCN), also known as "the mafia" and "the mob" that operates throughout the United States through entities known as families. Manocchio has held various leadership positions over the last 15 years, including underboss and boss, in the New England family of the LCN (NELCN).

As further described below, Manocchio's past behavior conclusively demonstrates that he poses a serious risk of flight and is a danger to the community. As such, there is no condition

1

or combination of conditions of release that would reasonably assure his appearance and the safety of the community, including the witnesses against him. For the reasons previously set forth in writing and orally at the hearing, and for the additional reasons set forth below, defendant Manocchio should be detained pending trial.

I.      **Defendant is a Risk of Flight**

In its original memorandum and at the initial detention hearing , the United States set forth extensive justification for defendant's risk of flight factors. For the most part, none of these assertions were disputed or challenged.  In a nutshell, Luigi Mannocchio, a longstanding organized crime boss and underboss of the NELCN has lived in the shadows, carefully forging an existence devoid from the traditional, unavoidable, financial footprints we all leave as we pass through legitimate society.  Despite his 83 years, he does not exist on paper financially. He has no known bank or other accounts, no known assets and no credit cards to his name.  Subpoenas directed to all three credit reporting agencies produce no information. Amazingly, he reports to U.S. Pretrial Services that he has only $900 cash on hand and has *no expenses and no liabilities*. Despite this lack of a paper trail, he does not live like a recluse, but instead, is able, through his NELCN influence and illicitly gained income, to travel extensively by commercial and private aircraft, both domestically and internationally. The United States hereby supplements its original memorandum with additional evidence of the serious risk of flight that Manocchio poses if released under any conditions.

   A.. **Lack of Candor with Court**

The flight risk this defendant poses is magnified by his lack of candor with the Court. According to the information presented by Pretrial Services in Florida following his arrest in

January, Manocchio stated that he had not left the country since 2001. This is a blatant misrepresentation, as government records confirm that he traveled to Italy for a week in July, 2009 with NELCN member Joseph Ruggiero, flying on Alitalia on July 17 and returning on July 24. According to an FBI confidential source, the purpose for this trip was for Manocchio to purchase property in Italy. Moreover, as stated in the government's initial filing, Manocchio's international travel on Frank Zammiello's private aircraft includes entries into the United States from Toronto, Canada in 2006, and Nassau, Bahamas in 2007. This misrepresentation is further evidence of his potential risk of flight and his inability to truthfully abide by any conditions set forth for his release.

Furthermore, Manocchio upon his arrest represented to pre-trial services that he only has $900 in cash with no expenses or liabilities. As set forth by the Indictment and evidence in this case, the United States' evidence will show that Manocchio and the NELCN have accumulated hundreds of thousands, if not millions of dollars in a 17 year plus extortion scheme of the adult entertainment industry. He therefore, obviously has the wherewithal to make whole any person who will come to his aid with bail. In any event, his lack of assets in his name as he has reported himself demonstrates his longstanding effort to hide his wealth, a condition wholly inconsistent with ties to the community and quite consistent with any future efforts to flee.

### B. Manocchio's Prior Flight

The United States strongly contends that Manocchio's past 10 year fugitive status is overwhelming evidence that he has the means and aptitude to flee when faced with serious charges. Counsel's proffer that he turned himself in and was granted secured bond after his ten year flight fails to recognize that it appears from all accounts that his return and subsequent

secured bond was a negotiated deal between his attorney and the Rhode Island Attorney General's office, arranged <u>before</u> he submitted to the authorities. Following his conviction, he was denied bond pending appeal.

Finally, the fact that Manocchio may have known about a federal investigation and yet did not flee (based upon a search of his person during the course of the investigation) does not make him any less a flight risk now that he has actually been charged. Based on news reports and the eponymous reported opinions cited by the government, it appears he did not flee immediately when he participated in the murders of Rudolph Marfeo and Anthony Melei in April, 1968, instead, he waited until he was indicted in August, 1969 before he fled. It is true that there has been significant media speculation about this investigation, going back to at least 2005, and yet, despite the speculation and despite the investigation, the government's evidence is that Manocchio continued to avail himself of the illegal, hidden income generated by the extortion of the adult entertainment industry and his position at the top of the NELCN. This demonstrates only that he has little concern with any federal investigation and will continue to live by his own rules, regardless of the rule of law.

**II. Defendant is a Danger to the Community:**

In addition to being a serious flight risk, Manocchio is a danger to the community as a leader of the NELCN. For 15 years, he directed the affairs of a longstanding criminal enterprise that has insinuated itself into various aspects of Rhode Island government, business and labor. His demonstrated ability to direct loyalists poses a threat to the government's witnesses and the population at large – his status in the NELCN allows him to insulate himself, yet still accomplish what is necessary.

In <u>United States v. Salerno</u>, 631 F. Supp. 1364, 1375 (S.D.N.Y. 1986), <u>order vacated</u>, 794 F.2d 64 (2d Cir.), <u>order reinstated</u>, 829 F.2d 345 (2d Cir. 1987), the district court ordered the detention of two leaders of the New York Genovese LCN Family, observing that:

> The activities of a criminal organization such as the Genovese Family do not cease with the arrest of its principals and their release on even the most stringent of bail conditions. The illegal businesses, in place for many years, require constant attention and protection, or they will fail. Under these circumstances, this court recognizes a strong incentive on the part of its leadership to continue business as usual. When business as usual involves threats, beatings, and murder, the present danger such people pose in the community is self evident.

<u>Salerno</u>, 631 F. Supp. at 1375.

In addition, to be detained as a danger to the community, an organized crime defendant need not be charged in specific predicate acts of violence; it is enough that his position is at the helm of a violent organization. <u>United States v. Ciccone</u>, 312 F.3d 535, 542-43 (2d. Cir. 2002). To be sure, courts' decisions to deny bail to organized crime leaders have not been based solely on the defendants' mere "association" with organized crime, but rather on the evidence that members of organized crime, and in particular, high-ranking members of organized crime, routinely engage in acts of violence as a result of their position in a criminal enterprise. As the court observed in <u>United States v. Leonetti</u>, Cr. No. 88-00003, 1988 U.S. Dist. LEXIS 5593 (E.D. Pa. June 9, 1988) at *10:

> The individual criminal acts allegedly committed by each defendant will be examined, but these individual acts must always viewed in the context of each defendant's alleged membership in La *Cosa Nostra* and what that membership and organization represents.

### III.  Elaborate Bail Packages Are Insufficient To Protect the Community Against Violent Organized Crime Defendants

The threat Manocchio poses to the community is not lessened by home confinement or electronic monitoring, for his danger lies in his ability to direct subordinates to commit crimes on his behalf, be they extortion of legitimate business or tampering with witnesses against him.  The Court suggests that a no-contact list would , as suggested by the Court, given the multiple means by which people communicate today, are wholly unenforceable and easily evaded.

As a longstanding NELCN underboss and boss, Manocchio still exercises vast influence in the NELCN. As of June of last year he still commands meetings with NELCN leaders and is a respected and feared leader. As demonstrated from his past crimes which include an NELCN murder, Manocchio has earned his position and status in the NELCN.  As such, if allowed to be released he will not be deterred from continuing to exercise this influence through the use of subordinates, associates and others who fear his status.

Many courts have rejected "elaborate" bail packages for dangerous defendants, including purported leaders of organized crime families shown to be involved in violent criminal activities. *See* Ciccone, 312 F.3d at 543 (rejecting $1 million bail secured by real property); U.S. v. Orena, 986 F.2d 628, 630-633 (2d Cir. 1993)(rejecting $3 million bail secured with real property, in-home detention, restricted visitation and telephone calls, and electronic monitoring); U.S. v. Colombo, 777 F.2d 96, 97-100 (2nd Cir. 1985)(rejecting $500,000 bail secured with real property).  The Second Circuit has explicitly held that home detention and electronic monitoring are insufficient to protect the community against dangerous individuals.  In U.S. v. Millan, 4 F.3d 1039, 1049 (2d Cir. 1993)(citations and internal quotations omitted), the Second Circuit held

that: "Home detention and electronic monitoring at best elaborately replicate a detention facility without the confidence of security such a facility instills. If the government does not provide staff to monitor compliance extensively, protection of the community would be left largely to the word of [the defendants]that [they] will obey the conditions."

Electronic monitoring does not adequately address this defendant's proven flight risk. At best, electronic monitoring "would only reduce the defendant's head start" should he decide to flee. United States v. Marra, 165 F. Supp. 2d 478, 486 (W.D.N.Y. 2001). According to Pretrial Services, the electronic monitoring bracelet can be removed with a simple set of heavy-duty scissors. Removed in the dead of night, it is doubtful that the alert system could operate to catch this defendant before his many willing associates would finance yet another trip out of state or out of the country.

Moreover, even while on a bracelet, home confinement and electronic monitoring are utterly ineffective in deterring organized crime defendants, particularly leaders such as Manocchio, from pursuing criminal activity. See United States v. Merlino, Cr. No. 99-363-01, 1999 U.S. Dist. LEXIS 6138 (E.D. Pa. December 15, 1999) at *11-12  (holding that Philadelphia LCN Family acting boss Joseph Merlino should be detained as danger to the community because house arrest in conjunction with an ankle bracelet would provide no guarantee that he would refrain from engaging in criminal meeting); United States v. Tavella, Cr. No. 94-127-11, 1994 U.S. Dist. LEXIS 6138 (E.D. Pa. May 5, 1994) at *6 (rejecting house arrest with electronic monitoring as sufficient conditions to eliminate the potential danger to the community posed by an associate of the Philadelphia LCN Family); United States v. Brunetti, Cr. No. 94-127-13, 1994 U.S. Dist. LEXIS 4223 (E.D. Pa. March 30, 1994)  * (rejecting the posting of property and house

arrest with electronic monitoring as means to protect the community from the danger posed by an associate of the Philadelphia LCN Family).

In Merlino, 1999 U.S. Dist. LEXIS 6138 at *11-12, the court addressed the insufficiency of house arrest with electronic monitoring by finding that defendant Merlino, as the acting boss of the Philadelphia LCN Family, could engage in criminal acts in a variety of ways, including communicating with visitors to his home and conducting criminal activity over cell phones which cannot be monitored by the government.  The court concluded that continued detention provided the best protection against the danger to the community posed by the organized crime leader.  Id.

Such is the same herein, for home confinement, posting of property, and electronic monitoring are wholly ineffective in keeping defendant from communicating with and directing the criminal acts of his LCN colleagues, members and associates.  He can communicate with them in a multitude of ways, none of which any order of this Court can prevent, short of detention.

## Conclusion

For the reasons cited above, the government hereby moves for a permanent order of detention with respect to defendant Manocchio. The defendant is a longstanding member and respected former leader of a criminal enterprise whose members have a long history of criminal activity and flight from prosecution. Accordingly, Manocchio presents a serious risk of flight and poses a danger to the community and should be detained prior to trial.

Respectfully submitted,

UNITED STATES OF AMERICA

By its Attorneys,

PETER F. NERONHA
UNITED STATES ATTORNEY

/s/ *Scott Lawson*
Scott R. Lawson
Sam Nazzaro
Trial Attorneys
Organized Crime & Racketeering Section
Criminal Division
U.S. Department of Justice

I hereby certify that on February 28, 2011 I filed the Government's Memorandum In Support of Detention electronically with service to all registered parties by the ECF system.

/s/ *Scott Lawson*
Scott R. Lawson
Trial Attorney
Organized Crime & Racketeering Section
Criminal Division
U.S. Department of Justice